**RAGSDALE et al. v. RAGSDALE.**

No. 11461.

Court of Civil Appeals of Texas.   Galveston.

May 27, 1943.

Rehearing Denied June 17, 1943.

Norman, Stone & Norman, of Jacksonville, and Shook & Shook, of Dallas, for appellants.

M. A. Greathouse, of Ft. Worth, and M. M. Guinn, of Rusk, for appellee.

CODY, Justice.

This is a suit by the heirs, and by the grantees of heirs, of John E. Ragsdale, deceased, primarily to cancel a certain trust agreement, dated September 24, 1937, by the terms of which he conveyed all his property in trust to C. D. Acker for defendant, Charlotte Ragsdale. Plaintiffs alleged that at the time said trust agreement was signed and at all material times, the said John E. Ragsdale was of unsound mind and mentally incompetent to understand the nature, character and effect of said instrument; in the alternative they alleged that if John E. Ragsdale executed said trust agreement, it was the result of undue influence.

John E. Ragsdale died November 8, 1937, and left surviving neither wife nor children. He left as his only heirs at law, a brother, W. B. Ragsdale, and the following nephews and nieces: E. B. Ragsdale, T. W. Ragsdale, Giffen Prather, Coly Morris, Daisy Morris, and Mrs. Nora Cureton, a widow. For the purpose of qualifying to testify as to transactions with the deceased, W. B. Ragsdale, the surviving brother, conveyed to his grandchildren, Paul Keith, Jr., a minor, and Yvonne Keith, a minor, all of his interest in the property of John E. Ragsdale, deceased; and E. B. Ragsdale likewise conveyed to his children, Sue and Baxter Ragsdale, minors, all of his interest in the property of aforesaid John E. Ragsdale, deceased. Before such conveyances were made, the said W. B. Ragsdale and E. B. Ragsdale had been parties plaintiff in this suit, but thereafter they dismissed their suit and their grantees were made parties plaintiff in their place, and sued by their next friend, Giffen Prather. The said Giffen Prather had also qualified as the administrator of the estate of John E. Ragsdale, deceased, and in addition to suing in his own right, and as next friend for aforesaid minor plaintiffs, Prather also sued as such duly appointed, qualified and acting administrator.

The defendant was not an heir at law of decedent, but a daughter of a first cousin. In addition to her answer, she filed a cross-action against plaintiffs, and E. B. Ragsdale and W. B. Ragsdale (who had conveyed away their interests) to recover the possession of the property of John E. Ragsdale, deceased, and the rents and revenues that accrued thereon. E. B. Ragsdale and W. B. Ragsdale each disclaimed any interest in the property in favor of their respective grantees, aforesaid.

The case was submitted to a jury upon two special issues, in response to which the jury found: 1st, That John E. Ragsdale, on September 24, 1937, was not of unsound mind; 2nd, That John E. Ragsdale was not caused to sign the instrument, dated September 24, 1937, and called a trust agreement, through undue influence exerted upon his mind and will. Upon such verdict the court rendered judgment that plaintiffs take nothing by their suit; and upon defendant's cross-action, at her request, the minor defendants were dismissed because they had not been served with process thereon, and the court further rendered judgment in defendant's favor upon said cross-action and against plaintiffs for the title and possession to the property specifically described in defendant's cross-action and in said judgment, and she also recovered from

W. B. Ragsdale the sum of $78.75. Defendant further recovered costs from the parties, other than the minors. (We have simplified the foregoing statement, by omitting therefrom one of the parties to said cross-action, and all mention that W. B. Ragsdale had died, and that his personal representatives were made parties defendant to defendant's cross-action, as this would unnecessarily complicate the statement and tend to confuse.)

■ We do not question that there was ample evidence to sustain the jury's verdict. Nor do we question that the evidence was also amply sufficient to have sustained a finding by the jury that on September 24, 1937, the date on which the trust agreement was executed, that John E. Ragsdale was of unsound mind. The evidence shows that on March 21, 1934, when deceased was 67 years of age, he complained to Dr. Bone, a physician of Jacksonville, Texas, of having gonorrhea. The evidence is that Dr. Bone treated him thereafter until June 5, 1934, and that while his physical condition became improved, his mental condition got worse. At Dr. Bone's suggestion, the deceased's brothers arranged for E. B. Ragsdale (a nephew) to take him from Jacksonville, where he lived, to Dallas for treatment. The deceased was first taken to the Dallas Medical and Surgical Clinic, where he stayed for five weeks, to be treated for his physical condition. Drs. O'Brien and Baird, who there treated him, considered him of unsound mind and concluded that he would have to be moved to a hospital equipped to handle mental cases. He was thereupon moved to Timberlawn, which was such an institution, and was treated for his mental and physical condition until August 28, 1934, when he was sent back home. It was the testimony of three doctors who had observed him at Timberlawn that while his extreme confusion became better, he would never become mentally sound, but would get progressively worse. Two of these same doctors saw the deceased again in September, 1937, the month the trust agreement was signed, and testified that he was still of unsound mind, and that in their opinion he had continued of unsound mind at all times between 1934 and 1937. Some twenty witnesses testified to the deceased's unsoundness of mind. Dr. Travis, another doctor of Jacksonville, testified that he had examined the deceased in early September, 1937, and that he was then insane. There was also testimony that a brother and a sister of deceased had died in insane asylums, and that he had a nephew of unsound mind.

The evidence further shows that on November 26, 1935, appellee took the deceased with her to Tyler where he knew no one, and to lawyers there, and with her present wrote a will for his signature, leaving everything to her. This will, duly executed, was introduced in evidence. Subsequently another like will was executed by deceased, August 12, 1936, in Tyler, leaving everything to appellee. This instrument is in evidence. Again, on April 29, 1937, appellee obtained from deceased a power of attorney, which is also in evidence. The evidence showed that until the year 1934, the deceased had spent very little money— not in excess of about $600 a year. He then, in 1935, bought five automobiles. In 1936 he spent from his bank account $8,-588.77; and in 1937, to August of that year, he spent from his bank account $3,068.85.

Upon the background of the foregoing evidence introduced by appellants, appellee's counsel, in argument to the jury, referred to E. B. Ragsdale, who took the deceased to Dallas, as "one of the conspirators in the case carried him out to Timberlawn Sanitarium, to be examined by Doctor Witt. What was he doing that for? Mind you, he evidently had heard John E. Ragsdale had executed a will, and he went back to his crony in crime, Dr. Terrill, 'I am in the hole, again. I want you to examine this man, again. He has been examined by Dr. Thomas', or something like that, 'We have got to do something', and he carried him out there under that ruse. * * *" Appellants duly objected that there was nothing in the record to justify such argument.

Again, this argument was made to the jury by appellee's attorney. "* * * I have heard of Dr. Cheavens and Dr. Witt, and they have heard of me. They recognized me when I walked in the room, when they were sitting on the witness stand."

(Mr. Shook (Appellants' attorney): "I do not know what he is referring to, but it is something not in the record.")

(The Court: "The objection will be overruled.")

"Now I do not know that Dr. Cheavens and Dr. Witt lied. When I get to their testimony, I want to explain to you just how clever those two men are. Take an exception to that, Mr. Shook."

(Mr. Shook: "I do take an exception to it.")

"We will find out whether it is a racket, from their own testimony, in a few minutes."

(Mr. Shook: "We ask that the court reprimand counsel for his conduct, in turning to me and trying to make it appear that I am doing an improper thing.")

(The Court: "There is no need to do that. Address your remarks to the jury, and we will have less interruption.")

(Mr. Shook: "We except.")

Again, appellee's counsel said · to the jury: "Ned (that is E. B.) Ragsdale took the old man over to Dallas, and then brought him back, and had his bank account cut off, so he could not even eat, and laying the plan to have him declared insane. * * * Ned Ragsdale had cut him off— the man that is in here, now; the blood sucker; that one; the man who sits over there, and smiled and grinned all during the case, no matter what kind of aspersions and things were cast against his own uncle —grinning now. Yes, I would grin too. I would not know what else to do about it."

(Mr. Shook: "We take an exception to remark of counsel.")

Again: "Now, then, that is the kind of family they are. Who are these other people that came in here, wanting this money? I think I termed some of them 'blood suckers' a while ago * * * if it was any member of my family * * * that had died, and left some money, and had not left it to me, but had left it to somebody else, I would not be in there trying to get something I had not earned, and that he did not want me to have. * * * I asked Ned if his father hadn't given him some money. I had heard that, that his father had given him several thousand dollars, and he had gone up there to Dallas and invested it * * * thought I'd find out, it might have a little bearing on this case, and I asked Ned if it wasn't a fact that the money his father had given him, he lost it. 'Oh, no, I went to S. M. U. I am a smart guy. I know all the answers. I put that money in an investment, and it is making money.' Sure it is. I don't doubt but what it is making money. Any man that could frame up a scheme and scheme up such a nefarious outfit as this kind of suit, is capable of making money, if he has the capital to operate on. Each of you

gentlemen know where they could make money, one way or other." ·

We fail to find anything in the record to support the foregoing arguments. It is the province of the jury to determine the weight to be given the evidence, but there is no basis for stating to the jury, in effect, that the evidence produced by appellants of the decedent's mental state was manufactured and sheer fabrication, and denouncing appellants as "blood suckers", "conspirators", and their witnesses as "racketeers". "The rule has been announced, and is adhered to by this court, that, when improper argument has been made, the adverse complaining party is entitled to a reversal of the judgment, as a matter of law, if, under all the circumstances there is any reasonable doubt of its harmful effect, or unless it affirmatively appears, no prejudice resulted." Chapin v. Putnam Supply Co., 124 Tex. 247, 76 S.W. 2d 469, 470; Smerke v. Office Equipment Co., 138 Tex. 236, 158 S.W.2d 302, 304. We certainly cannot say that it affirmatively appears that no prejudice resulted to appellants. Because of counsel's argument, the judgment must be reversed and the cause remanded for a new trial. In view of a new trial, we feel called upon to point out certain additional reversible errors, so that they will not be repeated.

The Court declined to permit Mrs. E. B. Ragsdale to testify that in her opinion the deceased was of unsound mind from 1934 to the date of his death upon the ground that she was a party to the suit, disqualifying her to testify to transactions with the decedent under Art. 3716. She is the wife of E. B. Ragsdale, a nephew of the decedent, and the mother of the two minor Ragsdale plaintiffs. The fact that she is the mother of parties to the suit gives her no vested interest in the subject matter of the suit. It has never been supposed that a child to a party to a suit disqualifies such child from testifying to transactions with deceased. Neither should the fact that a mother has a child that is a party to a suit disqualify her. The fact that a parent may owe a child the duty of support and education is too remote. Likewise, she did not own any vested right in any property inherited by her husband, her rights in her husband's separate property "are at best potential and contingent upon there being realized a profit by way of rents, revenues, or increase. These things are not directly

in this litigation, and, though such potential rights may be affected, it is merely incidental, in the same way that a child, as a prospective heir, might be interested in the parent's litigation. This would not constitute such child a party within the statute being considered." Mitchell v. Deane, Tex. Com.App., 10 S.W.2d 717. Obviously, where a husband sues for and recovers property constituting his separate estate, his right to recover such separate property relates back to the time his right to such property became vested, and the wife's right to share the rents and revenues therefrom relates back to the same time, and is contingent upon such recovery, and is hers as an incident to the community property laws of the State, and in the cited case, the contention that the wife was disqualified to testify because of community right in the rents and revenues from the separate property sued for was overruled. The court's refusal to permit Mrs. E. B. Ragsdale to testify upon the ground that she was disqualified by the Death Statute was error.

■■■■ The court likewise refused to permit E. B. Ragsdale to testify to his opinion of the decedent's insanity based upon transactions had with him, solely upon the ground that E. B. Ragsdale was disqualified by R.S. Art. 3716. As pointed out above, E. B. Ragsdale was originally a party plaintiff to the suit, but before the trial conveyed by general warranty deed all of his interest in decedent's property to his two minor children, upon the consideration of his love and affection for them. By this conveyance, E. B. Ragsdale did not subject himself to any pecuniary liability under the general warranty. In the first place, he merely conveyed his expectancy in the decedent's estate, and therefore conveyed only such rights as he actually inherited. In the second place, the rule for damages for breach of a general warranty is the consideration paid for it. Wiggins v. Stephens, Tex.Com.App., 246 S.W. 84, 85. Therefore, where the conveyance is a gift, it is without liability. In Oury v. Saunders, 77 Tex. 273, 13 S.W. 1030, 1032, it was held: "Gordon and wife had, pending the suit, conveyed all interest they had in the land to plaintiffs, which fact was afterwards set up by amendment of the petition, and the witness testified that he and his wife had no interest in the result of the suit.

The transfer to plaintiffs was not of such character as would make the witness or his wife liable over to plaintiffs if they lost the suit. We see no reason for holding the witness incompetent. 1 Greenl.Ev. §§ 386, 397, 419". In Matthews v. McLen, Tex.Civ. App., 131 S.W.2d 24, 25 (no writ applied for) it was held: "The rule is clearly announced by Chief Justice Gallagher in Albritton v. Commerce Farm Credit Co., Tex.Civ.App., 9 S.W.2d 193, 196, affirmed by the Supreme Court in [Tex.Com.App.], 17 S.W.2d 784, as follows: 'When a party to such a suit has disclaimed any interest in the property involved therein, or has been divested of any interest in such property by a voluntary conveyance to another without warranty * * * such party thereupon becomes only a nominal party to such suit, and competent to testify concerning transactions with and statements by the deceased affecting the issues involved therein'". The Court went on to hold that the deeds there involved conveyed only whatever interest to the father the children's mother had in the property, "Consequently, they were not absolute warranties of title on which the children would have been liable * * *." The general rule is that no one is incompetent to testify because of interest in the issue to be tried. R.S. Art. 3714. Provided a party in good faith divests himself by an absolute conveyance of any interest which renders him incompetent to testify under R.S. Art. 3716, his competency is restored. While, as appears above, the appellee sued E. B. Ragsdale by a cross-action for all property belonging to decedent, the subject of the trust agreement, it also appears that E. B. Ragsdale disclaimed in favor of his aforesaid minor children. The court erred in excluding the evidence of E. B. Ragsdale solely upon the ground that he was incompetent to testify because of Art. 3716.

■■■ What has been said applies with equal force to the depositions of W. B. Ragsdale, taken after he had conveyed his rights to his grandchildren and had dismissed his suit.

Appellants have submitted other points relating to matters which will probably not occur upon another trial.

Judgment is reversed and the cause remanded for a new trial.

Reversed and remanded.